IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELECTRICAL INSURANCE TRUSTEES HEALTH & WELFARE TRUST FUND, and the ELECTRICAL CONTRACTORS' ASSOCIATION AND LOCAL UNION 134 I.B.E.W. JOINT PENSION TRUST OF CHICAGO, | ) | |
| Plaintiffs, | ) | Case No. 24 C 11389 |
| v. | ) | Judge Robert W. Gettleman |
| WCP SOLAR SERVICES, LLC, an Illinois Limited Liability Company, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are multiemployer plans or "funds" that have sued defendant, WCP Solar Services, LLC, asserting a single "Count I" for breach of contract under the Employee Retirement Income Security Act ("ERISA") and the Labor Management Relations Act ("LMRA"). According to the operative first amended complaint, defendant is contractually obligated to report what hours union "bargaining unit employees" worked, and to pay contributions to plaintiffs for each hour worked. Plaintiffs allege that defendant failed to meet that obligation and thus owes plaintiffs for defendant's delinquent contributions. Plaintiffs further allege that although they were able to recover the bulk of the money owed, about $30,000 remains outstanding.

The parties have filed cross motions for summary judgment under Fed. R. Civ. P. 56. For the following reasons, the court denies plaintiffs' motion for summary judgment and grants defendant's motion for summary judgment.

## BACKGROUND

The funds receive contributions from employers under collective bargaining agreements between the employers and Local Union No. 134 of the International Brotherhood of Electrical Workers, Chicago, Illinois. The funds are thus multiemployer plans under 29 U.S.C. § 1002. Under a "Principal Agreement," they serve as the collection agent for contributions owed to certain "Ancillary Funds."

Defendant is an Illinois LLC that entered into a Letter of Assent on July 15, 2020, under which defendant agreed to be bound by the Principal Agreement then in effect. Under the Principal Agreement, defendant was bound by the provisions of certain "Trust Agreements," and under those Trust Agreements, the Trustees of the Funds adopted "Delinquency Collection Policy and Procedures" ("Collection Procedures"). Under the Principal Agreement, the Trust Agreements, and the Collection Procedures, defendant was required to "make monthly reports of hours worked by bargaining unit employees and pay contributions to [plaintiffs] and Ancillary Funds for each hour worked." Employers who fail to submit their monthly remittance reports and pay contributions to the funds and Ancillary Funds are responsible for the payment of liquidated damages and interest.

A payroll compliance audit that was conducted for the period of July 15, 2020, through December 31, 2020 (the "Audit Period"), revealed that defendant failed to pay $107,557.32 in contributions, resulting in $21,511.46 liquidated damages. In particular, defendant failed to pay both the contributions and working dues owed for September, October, and November 2020 to the Funds and Ancillary Funds.

In connection with these delinquencies, plaintiffs submitted a claim under a wage and welfare surety bond (No. E388260) (the "Bond") issued by Great American Insurance Company ("GAIC"), for which defendant was the principal and plaintiffs were the obligee. Plaintiffs' claim to GAIC included amounts for alleged unpaid contributions, liquidated damages, and related charges arising from the same Audit Period.

Plaintiffs received various payments from defendant in November 2020 and February 2021. They also received a check for $118,205.07 in October 2021 from GAIC in response to plaintiffs' bond claim.

As a condition of receiving the payment from GAIC, plaintiffs executed a written "Release and Assignment of Claim" in favor of GAIC dated September 30, 2021 (the "Assignment"), which provides:

> WHEREAS, WCP Solar Services Inc. ("Contractor"), has a collective bargaining agreement with Local 134 IBEW under which Contractor was to pay certain employee fringe benefits to the Electrical Insurance Trustees herein called Obligee, , and gave bond number E388260 to Obligee with Great American Insurance Company as Surety, herein called Surety, conditioned for the payment of fringe benefit claims;
>
> AND WHEREAS, WCP has failed to pay certain fringe benefits to Obligee as required by the collective bargaining agreement.
>
> AND WHEREAS, Obligee has made claim for an unpaid account thereof in the amount of $118,205.07.
>
> NOW THEREFORE, Obligee, in consideration of the sum of One-Hundred-Eighteen-Thousand-Two Hundred-five and 07/100s Dollars ($118,205.07), paid by Surety, has sold and by these presents does sell, assign and set over unto Surety, its successors and assigns, its claim against Contractor and anyone liable therefor together with all of its rights, title and interest in and to said claim or cause of action; and Obligee constitutes said assignee its true, lawful and irrevocable attorney to demand and enforce payment of said claim, and to sue for the said sum so assigned either in the name of Obligee, or in its own name.
>
> Obligee further hereby releases Surety from any and all claims and demands of every kind for unpaid fringe benefit claims relating to its collective bargaining agreement with Contractor.
>
> Obligee understands and acknowledges that Obligee will not be able to make any additional claims on relating to the collective bargaining agreement or bond. Furthermore, Obligee acknowledges that it intends these consequences even as to unknown claims that may exist as of the date of this release, regardless of the reason for Obligees's lack of knowledge of same.

The parties agree that following execution of the Assignment, GAIC filed suit in the Northern District of Illinois, Case No. 1:20-cv-5705 (the "GAIC action") against defendant and

others, asserting claims arising from the Bond claim, and seeking indemnification and recovery of losses, liabilities, costs, damages, expenses, and interest.[1] GAIC and defendant ultimately settled the GAIC action, and the court in the GAIC action approved the settlement and dismissed the case under the settlement agreement.

Plaintiffs claim that after applying all payments received from defendant and GAIC, defendant still owes plaintiffs $32,610.12 in liquidated damages for the Audit Period and liquidated damages and interest for the month of November 2020, and that they have expended $31,622.42 in attorneys' fees and costs in trying to collect the money.

## DISCUSSION

### Summary Judgment Standard

Both parties have moved for summary judgment. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the case under the governing law and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for resolution at trial. See id. at 249. The court must view all facts in the light most favorable to the nonmovant

[1] It is unclear how the GAIC action—which has a 2020 case number—could have been filed "following execution of the" Assignment. What's more, the First Amended complaint in that case was filed on September 17, 2021—before the September 30, 2021 execution date of the Assignment.

and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict for the nonmovant. Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir. 1988). If the record as a whole could not lead a reasonable factfinder to find for the nonmovant, there is no genuine issue for trial and summary judgment is appropriate. See Matsushita Elec., 475 U.S. at 587.

That the parties here have cross-moved does not disturb this framework. Indeed, "[t]he ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [the court] construe[s] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." Blow v. Bijora, Inc., 855 F.3d 793, 797 (7th Cir. 2017). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." Bloodworth v. Vill. of Greendale, 475 F. App'x 92, 95 (7th Cir. 2012). Even when the parties agree that there is no genuine dispute over material facts, the court can still deny both motions if the parties fail to establish their right to judgment as a matter of law. Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc., 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022). With these principles in mind, the court turns to the parties' arguments.

**The Parties' Dispute Hinges on Whether Plaintiffs Assigned and Released their Claim**

In their opening brief, plaintiffs argue that there is no dispute here that defendants breached the agreements and owe plaintiffs $32,610.12 in liquidated damages for the Audit

Period, and liquidated damages and interest for the month of November 2020. Plaintiffs further contend that attorneys' fees and costs are mandatory under the Principal Agreement, Trust Agreements, Collection Procedures, and ERISA, and that defendant thus also owes $31,622.42 in attorneys' fees and costs that plaintiffs have incurred in seeking to collect the money.

In its opening brief and in its response brief (which incorporates by reference its opening brief), defendant argues that because plaintiffs assigned and released all claims at issue—including unknown claims—to GAIC through the Assignment, plaintiffs do not own the claim here and therefore lack standing as a matter of law. Nor can plaintiffs argue, defendant contends, that they are entitled to "recover amounts beyond what was paid by GAIC—i.e., some alleged 'shortfall' remaining after the bond payment." That is because, defendant asserts, "[n]othing in the Assignment reserves any right for plaintiffs to later pursue a balance allegedly remaining after GAIC's payment." Defendant thus concludes that the court should grant summary judgment in its favor.

In response, plaintiffs contend that "defendant expressly admits the amounts owed and the failure to timely remit those payments," such that there is no genuine dispute over the damages calculation. Rather, plaintiffs argue, the "sole issue" here is "the legal question of whether Plaintiffs retain the right to recover those undisputed amounts following execution of the" Assignment. Plaintiffs assert that this question must be answered in their favor. The Assignment, they contend, "is narrowly drafted and claim-specific in that it expressly identifies a single assignment in the amount of $118,205.07 and provides that Plaintiffs 'sell, assign and set over' *that* claim to GAIC, along with the right 'to sue for the **said** sum.'" (Emphasis by plaintiffs). And the "release in the agreement is a release of GAIC, not" defendant. Because

the Assignment "reflects only a limited assignment of a single, identified claim for $118,205.07 to GAIC," plaintiffs assert, they "retain standing to pursue the additional amounts sought."

In reply, defendant agrees that "[t]his case turns on a single question: whether Plaintiffs retained the right to pursue the claims they now assert after executing the" Assignment. According to defendant, "[t]his case turns on assignment, not release," and the Assignment language "goes well beyond the language of a typical subrogation agreement or a partial assignment agreement": it "specifically sells and assigns its 'claim against Contractor [defendant] . . . together with all of [plaintiffs'] rights, title and interest in and to said claim or cause of action.'" Thus, defendant argues: the "Assignment does not transfer a dollar amount—it transfers a claim"; the $118,205.07 figure was "consideration for the Agreement—it is the amount GAIC paid in exchange for the claim"; the Assignment "expressly defines the 'Contractor' as [defendant]"; and "[o]nce plaintiffs assigned the claim, they no longer owned it—regardless of whether [defendant] was separately 'released.'" Finally, defendant asserts that the Assignment's last clause—which states that plaintiffs "will not be able to make any additional claims . . . relating to the collective bargaining agreement or bond," "even as to unknown claims"—has no language limiting it to claims only against GAIC.

**Whether Plaintiffs Assigned and Released their Claim against Defendant**

The parties do not expressly discuss what law applies to this assignment and release issue. A dispute over plaintiffs' claim that defendant breached the agreements and procedures under ERISA and LMRA would be governed by federal common law. See Cent. States, Se., Sw. Areas Pension Fund v. George W. Burnett, Inc., 451 F. Supp. 2d 969, 977-78 (N.D. Ill. 2006) ("When considering an ERISA claim, federal common law rules of interpretation apply.").

Here, though, the parties dispute the interpretation of the separate Assignment agreement. On that point, plaintiffs do not dispute that they could have assigned and released their claim. Rather, as just discussed, they argue that the scope of the assignment is narrow and claim-specific and that the release is limited to GAIC.

Because this case arises under ERISA and the LMRA, determining the scope of the Assignment agreement is also governed by federal common law. See Lumpkin v. Envirodyne Industries, Inc., 933 F.2d 449, 458-59 (7th Cir. 1991); cf. Ossey v. Hall's Rental Servs., Inc., No. 95 C 325, 1995 WL 692290, at *2 (N.D. Ill. Nov. 20, 1995) ("In federal question cases, the scope of a release is governed by federal law . . . ."). But the court looks to the substantive law of the situs state (here, Illinois), because "the federal law in this area arises through the incorporation of 'state rules of decision,' which 'furnish an appropriate and convenient measure of the governing federal law." Lumpkin, 933 F.2d at 458 (citation omitted) (examining "the law of release in Illinois" to determine scope of release of ERISA claims); see also Cent. States, Se. and Sw. Areas Pension Fund v. Art Pape Transfer, Inc., 881 F. Supp. 1168, 1172-73 (N.D. Ill. 1995) (relying on Illinois law to determine scope of release related to ERISA claims); cf. Ossey, 1995 WL 692290, at *2 ("In federal question cases, the scope of a release is governed by federal law, which draws upon complementary substantive law of the situs state.").

Both parties here appear to implicitly agree that the court should turn to Illinois law to resolve the dispute over the scope of the Assignment agreement. Indeed, they both rely on cases that analyzed contractual language under Illinois law. Plaintiffs, for example, cite Darvosh v. Lewis, 66 F. Supp. 3d 1130, 1135 (N.D. Ill. 2014), for the proposition that the court "must construe the words of a contract within the context of the contract as a whole." (Cleaned up).

In so holding, Darvosh applied Illinois law. And defendants, for example, cite Sterling Nat'l Bank v. Block, 984 F.3d 1210, 1217 (7th Cir. 2021), and Arrow Master, Inc. v. Unique Forming Ltd., 12 F.3d 709, 712 (7th Cir. 1993), for the notion that courts should give meaning to every provision of the contract and avoid superfluidity. Both of those cases also applied Illinois law. Defendant also cites the Illinois case, Ramsey Herndon LLC v. Whiteside, 2017 IL 121668, ¶ 20, for the proposition that an assignment of "all right, title and interest" effects a complete assignment. The court will therefore look to Illinois law on assignment and release in analyzing the Assignment agreement's scope.

The Assignment agreement was created in the context of a surety bond. A "surety bond is essentially an agreement to satisfy the contractual obligations of another party." Credit Gen. Ins. Co. v. Midwest Indem. Corp., 872 F. Supp. 523, 524-25 (N.D. Ill. 1995). "A contract is one of suretyship when one [the surety] obligates himself to pay the obligee, absolutely and wholly, without the necessity that the obligee exhaust his remedies against the principal before proceeding against the surety." Chandler v. Maxwell Manor Nursing Home, Inc., 281 Ill. App. 3d 309, 321 (1st Dist. 1996); see also Bridge v. McHenry Truck Lines, Inc., No. 96 C 4628, 1998 WL 427611, at *4 (N.D. Ill. July 24, 1998) (citing Chandler). The "principal is the person who is primarily liable and for whose performance of his obligation the surety has become bound." Chandler, 281 Ill. App. 3d at 323. A compensated surety generally "execut[es] surety contracts for compensation called a premium." Id. at 326. "The core purpose of the suretyship agreement is to insulate the obligee from the risk of a default by the principal." Shannon R. Ginn Const. Co. v. Reliance Ins. Co., 51 F. Supp. 2d 1347, 1350 (S.D. Fla. 1999) (cleaned up).

Here, defendant contractually agreed to pay contributions to plaintiffs. GAIC issued the Bond, under which defendant was the principal, plaintiffs were the obligee, and GAIC was the surety. Plaintiffs thereafter submitted a claim to GAIC under the Bond, which included amounts for alleged unpaid contributions, liquidated damages, and related charges arising from the Audit Period.

Typically, when a principal defaults, "the surety will settle with the obligee by taking a release and an assignment of the obligee's claim against the principal, at least to the extent of the settlement amount." John W. Hinchey, Surety's Performance over Protest of Principal: Considerations and Risks, 22 Tort & Ins. L.J. 133, 139 (1986). Depending on the scope of the release and assignment, the obligee may thereafter attempt to file a claim "against the principal for that portion of the obligee's claimed damages not included or otherwise made a part of the settlement with the surety." Id. at 140.

That is what plaintiffs are attempting to do here. But defendant argues that plaintiffs cannot do so because plaintiffs assigned the complete claim. The court agrees with defendant.

"An assignment of a right is a manifestation of the assignor's intention to transfer a particular right by which the assignor's right to performance is terminated in whole or in part, and the assignee acquires the right." Chemetall GMBH v. ZR Energy, Inc., 320 F.3d 714, 720 (7th Cir. 2003) (quoting Bd. of Managers of Medinah on the Lake v. Bank of Ravenswood, 692 N.E.2d 402, 405 (1998) (citing RESTATEMENT (SECOND) OF CONTRACTS § 317(1) (1981))). "[A]n assignor may transfer some or all of its rights." Id. at 723. "Choses-in-action (i.e., 'a legal claim,' or 'something on which an 'action' (a lawsuit) might be founded, such as a

right to recover a debt, are generally assignable under Illinois law." Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc., 412 F. Supp. 3d 941, 949 (N.D. Ill. 2019) (cleaned up).

"Assignments are governed by contract law," and are "subject to the same requisites for validity," "such as intent," "as are other contracts." 1400 Museum Park Condo. Ass'n by Bd. of Managers v. Kenny Constr. Co., 2021 IL App (1st) 192167, ¶ 46 (citation omitted). Ordinarily, "if the contract language is clear and unambiguous, the parties' intent must be ascertained exclusively from the plain language of the contract as a matter of law." Kaplan v. Shure Bros., 266 F.3d 598, 604 (7th Cir. 2001). Yet "Illinois courts have at times departed from this rigid rule and have more liberally availed themselves of extrinsic evidence when construing assignments, as opposed to other types of contracts." Id. at 605 (collecting cases); see also Chemetall, 320 F.3d at 721 (analyzing an assignment under Illinois law and stating that "[t]he intent of the parties is a question of fact to be derived not only from the instrument executed by the parties, but also from the surrounding circumstances" (cleaned up)).

Like an assignment, a release is also a type of contract. Hampton v. Ford Motor Co., 561 F.3d 709, 714 (7th Cir. 2009). "Where a contractual release is clear and explicit," the court "must enforce it as written." Id. "A contract is ambiguous if its terms may reasonably be interpreted in more than one way, but it is not rendered ambiguous simply because the parties disagree upon its proper construction." Id. (cleaned up). "Rather, an ambiguous contract is an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." Id. (cleaned up).

The court finds that no reasonable factfinder could find for plaintiffs on the issue of whether the Assignment agreement, along with the surrounding circumstances, assigned

plaintiffs' claim against defendant in this action to GAIC. The Assignment agreement states that the "Contractor" (defendant) "has a collective bargaining agreement with" the union under which defendant was to pay "certain employee fringe benefits to . . . Obligee" (plaintiffs), and defendant "gave" the Bond to the plaintiffs with GAIC "as Surety." The Assignment agreement further states that defendant "failed to pay certain fringe benefits to Obligee as required by the collective bargaining agreement," and that plaintiffs have "made a claim for an unpaid account thereof in the amount of $118,205.07." (Emphasis added). It is undisputed that plaintiffs' claim to the surety (GAIC) included amounts for alleged unpaid contributions, liquidated damages, and related charges arising from the Audit Period. And plaintiffs do not dispute defendant's assertion that plaintiffs seek in the current action to recover additional amounts allegedly arising from the same Audit Period and the same underlying contribution obligations. The Assignment then further states that plaintiffs, "in consideration of the sum of" $118,205.07 "paid by [GAIC]," "sold . . . assign[ed] and set over unto [GAIC] . . . its claim against [defendant] and anyone liable therefor together with all of its rights, title and interest in and to said claim or cause of action." (Emphasis added).

"When an assignor 'assigns, transfers, or sets over' 'all the rights, title and interest' of a claim to the assignee," as plaintiffs did here, "that assignment includes transferring the 'injury.'" In re Turkey Antitrust Litig., 727 F. Supp. 3d 756, 764 (N.D. Ill. 2024) (quoting Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 286 (2008)). And such language effects a "complete assignment." Charles Schwab Corp. v. Bane of Am. Sec., LLC, No. 10-CV-03489-LHK, 2011 WL 864978, at *3-4 (N.D. Cal. Mar. 11, 2011) (citing Sprint for the

proposition that an assignment of "all rights, title and interest" is a "complete assignment" and that "assignees . . . are considered real parties in interest").

Plaintiffs place significant weight on the sentence in the agreement that follows the all "rights, title and interest in and to said claim or cause of action" sentence, in which plaintiffs provide GAIC with power of attorney to "sue for the said sum so assigned." (Emphasis added). According to plaintiffs, this shows that the assignment is "expressly limited to the defined dollar amount paid out on the bond."

The court disagrees. That phrase simply describes how the assignee (GAIC) may enforce the assigned claim, and cannot be reasonably understood to limit the preceding broad "all rights, title and interest" language, which plainly refers to the "claim" or "cause of action" for the unpaid account—"not to the specific dollar amount." Lowrance v. Hacker, 888 F.2d 49, 52 (7th Cir. 1989).

Lowrance is instructive on this point. The plaintiff there (Lowrance) was a commodities broker at the "Rosenthal" firm. Id. at 50. Under Rosenthal's policy, brokers had to pay for any deficits in their customer's account if the customer failed to pay. Id. The defendant (Hacker) was Lowrance's customer, and subject to a commodity-trading agreement between Hacker and Rosenthal, which called for Hacker to pay "reasonable attorneys' fees should an attorney be employed to enforce collection" of any deficits. Id. Hacker defaulted, and despite making contributions, still owed Rosenthal $52,309.30. Per its policy, Rosenthal collected that amount from Lowrance, and in return gave Lowrance an assignment of its claim against Hacker, which contained similar language to the Assignment agreement here. In particular, the assignment stated that Rosenthal assigns to Lowrance: "all of its right, title and interest in and to the

following claims and accounts due it from: Stephen J. Hacker, Account No. 68906, $52,309.30. The total amount of said claims and accounts assigned hereby is $52,309.30." Id.

After Lowrance sued Hacker to recover the amount, Hacker was ordered to pay Lowrance's attorneys' fees. Id. at 50-51. Hacker appealed, arguing that the assignment did not include an assignment of the right to attorneys' fees. Among other things, he, like plaintiffs here, argued that "the dollar amount stated as the value of the accounts limits the amount assigned." Id. at 51.

The Seventh Circuit rejected his argument. It explained that "[t]he dollar amount was merely an accurate statement of the principal value of the claims and accounts due and owing and assigned as of the time of the transfer of collection rights from Rosenthal to Lowrance." Id. But that did not require the court "to hold that the instrument transferred only that amount of the claims and accounts." Id. at 51-52. The court instead "interpret[ed] the words 'all right, title and interest' to refer to the account, including the right to any reasonable costs incurred in the collection of the same, and not to the specific dollar amount." Id. at 52. "If Hacker's interpretation were correct," the court explained, "the assignment would be nothing more than a nonrecourse draft on Hacker issued by Rosenthal." Id. The court thus concluded: "This was not a draft, but an assignment, and we hold that it included all rights in account number 68906, including not only the right to collect the principal amount owing, but also the related right to payment of attorneys' fees." Id.

Here, as in Lowrance, if plaintiffs had assigned only the specific dollar amount, the assignment would be nothing more than a nonrecourse draft on defendant issued by plaintiffs. This court therefore similarly concludes "the words 'all right, title and interest' to refer to" the

claim for the unpaid account—including the right to any interest or fees related to the same—"not to the specific dollar amount." Id.

Plaintiffs also argue that "[h]ad the parties intended to . . . strip Plaintiffs of their ability to recover additional delinquent contributions directly from [defendant], those terms would have been specifically listed in the Release." But that gets things backwards. Had plaintiffs intended only a partial assignment, it should have included language suggesting that "the assignor retains an identifiable and enforceable residuary interest" in the claim. Hauser v. Western Group Nurseries, Inc., 767 F. Supp. 475, 485, n.17 (S.D.N.Y. 1991); cf. Ramsey, 2017 IL 121668, ¶ 22 (examining whether instrument conveying "all of [the assignor's] right, title and interest" contained an "exception or reservation").

There is no such language here: the Assignment agreement does not state that it was in some way a partial assignment, that plaintiffs retained some interest in the claim for the unpaid account, that there was some amount of the unpaid account that plaintiffs were owed, or that there was a total amount that defendant owed that exceeded the amount that GAIC paid. To the contrary: the Assignment agreement states that plaintiffs "understand[ ] and acknowledge[ ] that [plaintiffs] will not be able to make any additional claims on [sic] relating to the collective bargaining agreement or bond," and that they "intend[ ] these consequences even as to unknown claims that may exist as of the date of th[e] release." There is simply no indication here that plaintiffs were attempting to retain any rights. See Etransmedia Tech., Inc. v. Allscripts Healthcare, LLC, 448 F. Supp. 3d 910, 915 (N.D. Ill. 2019) (distinguishing a case in which the assignment "explicitly assigned all rights for the purposes of collection" to the assignee, from one "in which the purported assignor retained the right to his share of proceeds from litigation as

well as the right to terminate the power of attorney, rights inconsistent with a total transfer of ownership" (cleaned up)).

In short, the court finds that plaintiffs made a complete assignment of their claim against defendant to GAIC. The court therefore now turns to what effect that has here.

Rule 17(a)(1) requires that "[a]n action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a)(1)—"that is, of the person who owns the claim," Etransmedia, 448 F. Supp. 3d at 913. "[A]n assignment puts the assignee into the shoes of the assignor." Milam v. Selene Fin., LP, 163 F.4th 416, 420 (7th Cir. 2025) (citation omitted). This means that "the unconditional assignee of a complete chose in action is the real party in interest and suit must be brought in his name." Etransmedia, 448 F. Supp. 3d at 914 (citation omitted); see also Rawoof v. Texor Petroleum Co., 521 F.3d 750, 763 (7th Cir. 2008) (Ripple, J., dissenting) ("[F]ollowing a valid assignment of a chose in action, a corporation may not bring an action to enforce the rights assigned."). Thus, because plaintiffs assigned their claim to GAIC, they are not the real parties in interest to their asserted claim and cannot bring this action to enforce that claim.

Rule 17(a)(3), though, provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action," and that "[a]fter ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3). Here, plaintiffs have not sought to invoke Rule 17(a)(3) to have GAIC ratify, join, or be substituted into this action. Nor

have they argued in their response and reply brief that they would do so if the court found that plaintiffs were not the real party in interest.

Plaintiffs have accordingly not shown that the court should invoke Rule 17(a)(3) to avoid granting summary judgment dismissing their claim. See Etransmedia, 448 F. Supp. 3d at 917 (explaining that the plaintiff could not "invoke the Rule to hand the baton to the" real party in interest); see also Consul Gen. of Republic of Indon. v. Bill's Rentals, Inc., 330 F.3d 1041, 1047-48 (8th Cir. 2003) (rejecting the plaintiff's argument that it should allowed to cure a real-party-interest defect under Rule 17(a) where it "was aware of the objection concerning real party in interest at least 18 months prior to the district court's ruling on the issue," explaining that "[b]ecause the [plaintiff] had the opportunity to . . . amend the complaint, but purposely chose not to do so, . . . the district court did not err in dismissing the complaint with prejudice").

In sum, because plaintiffs are not the real parties in interest, the court denies their motion for summary judgment, and grants defendant's motion for summary judgment.[2]

[2] Because the court can resolve the motions based on assignment, the court does not reach the issue of whether plaintiffs also separately and independently released or waived their claim.

## CONCLUSION

For the above reasons, the court denies plaintiffs Electrical Insurance Trustees Health & Welfare Trust Fund, Electrical Contractors Association and Local Union 134 I.B.E.W. Joint Pension Trust of Chicago's motion for summary judgment [43]. The court grants defendant WCP Solar Services, LLC's motion for summary judgment [46], and enters judgment for defendant. Civil case terminated.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: November 10, 2026**